**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| WESTROCK SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 0:18-cv-00781-MGL |
| v. | ) | |
| | ) | **COMPLAINT** |
| TONYA HUFFMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

PLAINTIFF WestRock Services, Inc. ("Plaintiff" or "WestRock Services") files its Complaint against Defendant Tonya Huffman ("Defendant" or "Huffman") as follows:

## THE PARTIES

1.     Plaintiff WestRock Services is a Georgia Corporation with its principal place of business located at 1000 Abernathy Road, NE, Atlanta, Georgia 30328.

2.     Defendant Tonya Huffman, an individual, is a resident of South Carolina. Huffman may be served with process at 313 Forest Walk Lane, Fort Mill, York County, South Carolina 29708.

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1331, because WestRock Services asserts claims against Huffman for violations of federal law, specifically the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et *seq.*

4.     In addition, subject matter jurisdiction exists pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

1

5.    This Court has supplemental jurisdiction over WestRock Services's state-law claims under 28 U.S.C. § 1367(a), because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.    This Court has personal jurisdiction over Huffman because she is a resident of York County, South Carolina.

7.    Venue is proper in the District of South Carolina, Rock Hill Division, because Huffman was based in this District when she committed the improper acts described herein.

## FACTS COMMON TO ALL COUNTS

### I.    WestRock Services and its business.

8.    WestRock Services is a wholly-owned subsidiary of WestRock Company ("WestRock") which is a publicly traded, multinational and multi-state provider of paper and packaging solutions for the consumer and corrugated packaging markets.

9.    WestRock was formed in 2015 as a result of a merger between Rock-Tenn Company and MeadWestvaco Corporation.

10.    WestRock Services is engaged in interstate commerce – it has operations in multiple U.S. states, and as a result of WestRock Services's sales activities, WestRock products ship across state lines to customers on a daily or weekly basis.

11.    WestRock, through its subsidiaries, produces a comprehensive range of differentiated substrates of paper, both paperboard and containerboard, through its global network of mills.  WestRock sells some of that paperboard and containerboard product to other companies.  WestRock also converts its containerboard and paperboard in its global network of plants and facilities, producing a wide variety of stock and custom packaging solutions for use in

2

different markets, such as beverage, food packaging, food service, commercial print, tobacco, retail, home & garden, and health and beauty. Examples of these products include kids meal boxes, pizza boxes, bakery boxes, frozen food packages, beverage multipack cartons, shipping cartons, cereal boxes, ice cream containers, labels, partitions and merchandising displays, among others.

## II.    Huffman's employment with WestRock Services and its predecessor companies.

12.    WestRock Services formerly employed Huffman as a senior sales executive with responsibility for many of WestRock Services's largest national customer accounts. Huffman worked in WestRock Services's Consumer Packaging business segment.

13.    In the aggregate, Huffman worked for WestRock Services and/or WestRock predecessor companies for over 18 years.

14.    Huffman was hired in 1999 while she was still in college as a Corporate Procurement Manager by Gulf States Paper Corporation, a corporation that was subsequently acquired by Rock Tenn Company (making it one of WestRock's predecessor companies).  In 2005, Huffman went to work for a subsidiary of MeadWestvaco Corporation.  It was during her employment with MeadWestvaco that she was promoted to her first sales role, as an Account Executive for the Midwest Region, selling paperboard products.

15.    In 2006, MeadWestvaco promoted Huffman to the position of Senior Account Executive for the Southern Region – Paperboard.

16.    In 2013, MeadWestvaco again promoted Huffman to the position of Sales Representative, Paperboard – National Accounts.

17. Prior to her resignation, WestRock Services and its WestRock predecessors were the sole source of Huffman's sales training and introduction to the paperboard and packaging industry.

18. WestRock Services provided Huffman with substantial resources for the specific purpose of developing customer relationships and goodwill for WestRock Services, and paid or reimbursed all or substantially all of her expenses in that regard.

19. Huffman became a WestRock Services employee as a result of the Rock Tenn Company / MeadWestvaco Corporation merger but kept her same title and responsibilities.

20. Huffman's principal job function was to develop relationships with many of WestRock Services's largest paperboard customers.

21. Huffman had regular direct contact with those key customers, and was WestRock Services's primary point of contact for many of those customers.

22. Huffman worked principally from her home office in York County, South Carolina.

III. **WestRock Services provided Huffman with trade secrets.**

23. WestRock Services entrusted Huffman with valuable trade secret information to assist her in performing her job.

24. This included (among other things) confidential customer lists and analyses, business plans and strategies, operational reports, financial reports and analyses, production processes, procedures and schedules, technical information, and information related to research and development.

4

25.    WestRock Services at all times instructed and expected Huffman to use such information on behalf of WestRock Services, and to not take or use such information for a competing business.

**IV.    WestRock Services takes reasonable and practical steps to protect its trade secrets.**

26.    WestRock Services takes reasonable and practical steps to protect its trade secrets and confidential information.

27.    WestRock and WestRock Services have a "Code of Conduct" that informs employees, among other things, that they are prohibited from "[u]sing business opportunities identified for WestRock for personal gain" and "[c]ompeting with any WestRock business." Code of Conduct page 9.  A true and correct copy of the Code of Conduct is attached as Exhibit A to the Affidavit of Colleen Hebert, filed contemporaneously with Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

28.    The Code of Conduct also informs employees that WestRock Services's "proprietary business information and our intellectual property are some of [its] most valuable assets . . . the obligation to protect proprietary business information extends beyond our workplace and working hours and continues even after employment ends."  *Id.* at 20.

29.    WestRock Services reminds employees in its Code of Conduct to mark sensitive documents as "confidential" or "trade secret," to keep such documents "secured in your office or cubicle" and to ensure a corporate Nondisclosure Agreement is in place before sharing sensitive information with customers or other business partners.  *Id.*

30.    Huffman attended and completed WestRock Services's required Code of Conduct training course on multiple occasions, most recently on or about January 12, 2017.  A true and correct copy of Huffman's training record is attached as Exhibit B to the Affidavit of Colleen

Hebert, filed contemporaneously with Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

31.    MeadWestvaco (WestRock's predecessor), similarly trained Huffman on the protection of confidential information and trade secrets.

32.    WestRock Services's policies, in general, are disseminated and available to employees on its intranet, to which all employees have access.

33.    WestRock Services's "Acceptable Use Policy," governs the use of WestRock Services's IT systems and computer networks, provides additional requirements.   A true and correct copy of that policy is attached as Exhibit C to the Affidavit of Colleen Hebert, filed contemporaneously with Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

34.    The Acceptable Use Policy expressly prohibits employees from using WestRock Services's systems to disclose trade secrets, intellectual property, or proprietary/confidential information.  *Id.*

35.    The Acceptable Use Policy specifically prohibits employees from sending trade secrets through WestRock Services's systems for their personal use.    *Id.* at 3.

36.    The Acceptable Use Policy identifies several classes of information security, and requires users to apply appropriate security controls in order to protect WestRock Services's proprietary data.  *Id.* at 9.

37.    The Acceptable Use Policy requires users to secure their workstations both physically and electronically, and prohibits users from trying to circumvent security controls.  *Id.* at 10.

38.    The final section of the Acceptable Use Policy states as follows:

Unless expressly authorized by the CEO, CFO or General Counsel, copying, sending, transmitting or otherwise distributing or disseminating WestRock confidential, trade secret or proprietary data or information, including without limitation, WestRock technical or financial information, customer and supplier lists, pricing information, legally protected personally identifiable information, and other protected, sensitive, confidential or secret information is **strictly prohibited**. Unauthorized use or dissemination of this information may result in disciplinary action, up to and including termination, as well as potential substantial civil liability, and criminal penalties under state and federal laws such as securities laws and the Economic Espionage Act of 1996.

39.    WestRock Services's Confidential Information and Trade Secrets Policy similarly protects WestRock Services's trade secrets, confidential information, and property.   A true and correct copy of that policy is attached as Exhibit D to the Affidavit of Colleen Hebert, filed contemporaneously with Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

40.    The Confidential Information and Trade Secrets Policy requires employees, among other things, to:

a.    Protect confidential information;

b.    Guard against the unauthorized release of confidential information;

c.    Exercise reasonable prudence and care in handling confidential information;

d.    Limit disclosure of confidential information with only those who have a need to know that information;

e.    Identify confidential information in writing; and

f.    Ensure nondisclosure agreements are in place before sharing confidential information with outside parties.

7

41.    WestRock Services and/or the WestRock predecessor companies require(d) employees to execute agreements that govern confidentiality, prohibitions on the misuse of proprietary information, and prohibitions on the misuse of e-mail and the company's computer systems.

42.    WestRock Services maintains and stores its confidential information and trade secrets on a secure, password-protected internal computer network and in a secure paper-based file system.

43.    Only authorized personnel are able to log in to WestRock Services's computer system.  Data is restricted to only those that have a business reason to access that data.

44.    Employees are required to use complex passwords and to change them regularly.

45.    If employees work remotely, they must authenticate their identity using multi-factor authentication to access the WestRock network.

46.    Data stored in WestRock Services's network or sent *via* its messaging systems are protected by anti-virus technology.  The WestRock network is monitored 24x7 by an external monitoring company which is responsible detecting and escalating security events.

47.    WestRock Services provides comprehensive security policies and new employee training regarding acceptable use of the Company's IT systems and computer networks in order to protect the integrity of WestRock Services's information, data, and files stored in its network.

48.    Any sensitive paper materials must be kept secure in employees' offices or workspace.

49.    WestRock Services's offices have restricted entry, and visitors must wear identification badges and be escorted or supervised by WestRock Services personnel at all times.

8

**V.    Huffman abruptly resigns to go to work for a competitor.**

50.    Huffman unexpectedly resigned her employment on December 6, 2017, to go to work for Sappi North America, the North American arm of Sappi Limited, a South Africa-based paper and wood products company and a WestRock Services competitor (collectively, "Sappi").

51.    Just before her resignation, Huffman informed one of her supervisors, Kevin Sullivan (Senior Vice President of Sales, North American Paperboard), that she was going to work for another company, but refused to identify her new employer.

52.    Sappi has not historically been a major supplier of bleached paperboard products for consumer packaging ("SBS") in North America, at least nowhere near to the same extent as WestRock.

53.    In 2016, however, Sappi announced that it would invest $165 million to refurbish a paper machine in Skowhegan, Maine, and would begin producing paperboard consumer packaging products out of that plant in May 2018.  A copy of the press release describing Sappi's plans is attached as Exhibit A to the Affidavit of Kevin Sullivan, filed contemporaneously with Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

54.    On information and belief, Sappi hired Huffman because of her familiarity with certain WestRock Services customers and her experience with WestRock Services's consumer packaging business.

**VI.    Huffman steals WestRock Services's trade secrets and proprietary information immediately before her resignation.**

55.    Despite being obligated to protect WestRock Services's propriety information, during the final eight (8) days of her employment Huffman used her WestRock Services e-mail

to send multiple WestRock Services documents containing trade secrets to her personal e-mail account, in violation of widely-known and clearly articulated WestRock Services policy.

56.    Huffman was not authorized to send this information to her personal email account nor did she have any legitimate business reason to send that information to her personal account.

57.    The materials Huffman misappropriated included confidential customer lists and customer information, product production schedules, copies of WestRock Services's strategic sales and business plans, confidential information about products in development, and copies of WestRock Services's internal business processes.

58.    Not only did Huffman e-mail herself documents in her possession as a result of her being a trusted WestRock Services sales executive, but during the final days of her employment Huffman *actively solicited* new confidential documents and information from other WestRock Services employees, which she the promptly e-mailed to her personal account.

59.    No valid reason exists for Huffman to have sent any of the foregoing information to her personal account.

60.    The documents Defendant emailed to herself are exactly the type a departing employee would take in order to unfairly compete with her former employer.

61.    Huffman intended to steal WestRock Services's documents and information and use it to her benefit with her new employer.

62.    In February 2018, a key customer representative reported to WestRock Services that Huffman had contacted him on behalf of Sappi.  The customer representative expressed surprise that Huffman had contacted him, and asked how she might have gotten his e-mail address.

10

63.    The customer was someone with whom Huffman had no prior material business contact, and about whom she should have had little or no material information.

64.    In response to the customer's report, WestRock Services diligently reviewed Huffman's WestRock Services e-mails.

65.    Upon doing so, WestRock Services discovered, as noted above, that Huffman had sent multiple highly confidential and/or proprietary WestRock Services documents to her personal e-mail account during the final eight (8) days of her employment.

66.    The e-mails were sent in clusters – often within a few minutes or seconds of each other – all shortly before Huffman resigned on December 6, 2018.

**A.    Huffman misappropriated a confidential customer list.**

67.    On December 4, 2017 at 10:37 a.m., Huffman e-mailed herself a highly-confidential list of more than eighty of WestRock Services's highest-revenue producing clients (the "Key Customer Analysis").

68.    The Key Customer Analysis is a WestRock Services trade secret.

69.    Updated on November 27, 2017 (nine (9) days before Huffman's departure), the Key Customer Analysis: (a) includes only WestRock Services's most lucrative consumer packaging customer relationships, (b) describes WestRock Services's annual sales to the listed clients; (c) specifically identifies by name and title the key internal buyers, product users, decision-makers or "decision influencers" for each client, and provides the contact information for those individuals; and (d) sometimes identifies the WestRock Services facility the company uses to fulfill those customers' requirements.

70.    The Key Customer Analysis is a highly valuable and confidential document complied and updated by WestRock Services at great expense and over a long period of time.

11

71.    It would, from a practical standpoint, provide the "keys to the kingdom" for a competitor's targeted sales effort designed to take market share from WestRock Services.

72.    It shows which WestRock Services customers are the most valuable based upon annual sales volume, providing a shortcut for competitors to identify and attempt to interfere with WestRock Services's most economically significant customer relationships.

73.    It also shows how to best contact those customers, by identifying key decision-makers for each customer and listing their contact information – information hard-won by WestRock Services as a result of its unique and longstanding relationships with those customers.

74.    The e-mail Huffman forwarded that included WestRock Services's Key Customer Analysis included additional reports related to (a) WestRock Services products scheduled to ship; (b) WestRock Services's business development efforts with specific potential clients; and (c) internal analyses regarding competitor activities.

75.    This information is similarly confidential, especially the information about WestRock Services's interactions with potential new clients.

76.    The information compiled in the Key Customer Analysis is not available to the public – especially WestRock Services's customer-specific revenues, its compilation of key internal decision-makers for each respective client, and its identification of the WestRock Services facilities associated with each client's products.

77.    It would be extremely difficult, if not impossible, for a competitor without its own independent access to WestRock Services's customers to compile the information contained in the Key Customer Analysis on its own.

**B.    Huffman misappropriated WestRock Services's strategic business records.**

    **1.    Quarterly Forum Report**

78.    Another key document Huffman forwarded to herself at 9:56 a.m. on December 4, 2017 was a 48-page presentation related to WestRock Services's November 30, 2017 Consumer Packaging Quarterly Forum (the "Quarterly Forum Report") – a private meeting held for WestRock Services employees in its Consumer Packaging division.

79.    Page 12 of the Quarterly Forum Report expressly states "This presentation likely includes material nonpublic information, and you should neither trade on this information nor share it with others outside WestRock."

80.    Among other things, the Quarterly Forum Report identified some of WestRock's and/or WestRock Services's best-performing employees (valuable if a competitor was inclined to recruit WestRock personnel); included information regarding the companies; safety measures, OSHA incident rates, and employee injury rates; included a detailed analysis of the companies' 2017 business performance; and included strategic analysis, targets, and business plan for 2018.

81.    Listed in the report are WestRock Services's priorities and specific action items it intends to take within its various corporate divisions.

82.    The Quarterly Forum Report would be highly valuable to a competitor, as it provides a detailed outline of WestRock Services's entire 2018 strategy within the consumer packaging market.

83.    The Quarterly Forum Report is confidential and a trade secret.

    **2.    Market Intelligence Report.**

84.    WestRock Services produces a confidential quarterly "Market Intelligence Report" for its sales force that analyzes sales data from the prior quarter, considers the reasons

why WestRock Services was successful or unsuccessful as to particular sales bids, and sets forth WestRock Services's sales strategies for the immediate future in light of that data.

85. In addition, the Market Intelligence Report analyzes certain competitor activities for WestRock Services's sales personnel to use in competing with those other companies.

86. On November 29, 2017, Huffman emailed herself WestRock Services's most recent Market Intelligence Report (dated November 28, 2017).

87. It contains the information described above for the final quarter of 2017.

88. This information would be highly valuable to a competitor, principally because it highlights WestRock Services's own competitive strengths and weaknesses, but also because it provides non-public analysis of the market in general.

89. It could be used tactically by a competitor to solicit customers using information WestRock Services has internally identified as inhibiting its own sales efforts.

### 3. Demopolis Report.

90. Also on December 4, 2017, at 9:58 a.m., Huffman e-mailed to her personal account an activity report related primarily to WestRock's Demopolis, Alabama paperboard mill for the weeks of November 20, 2017 through December 1, 2017 (the "Demopolis Report").

91. The Demopolis Report included information about recent production, customer issues, sales and marketing efforts and opportunities, and the results of testing for a confidential project WestRock was conducting in Demopolis.

92. The report is for internal use only, and was distributed only to select individuals – including Huffman – who were senior sales personnel and/or had a "need to know" some or all of the information contained in the report.

14

93.    Because it broadly addressed recent developments in Demopolis, not all of the information in the Demopolis Report was directly relevant to Huffman's scope of work for WestRock Services – specifically the testing related to the confidential project described above.

94.    On December 3, 2017 at 9:30 p.m., Huffman e-mailed WestRock Services manager Shone Jones (the owner of the report) and specifically asked "Hey Shone – what is the [confidential project] listed below about?"

95.    Jones responded at 9:56 a.m. on December 4, 2017 with a description of the project, including the challenges the mill was facing, noting specifically that the project was "still in the developmental stage[.]"

96.    Huffman immediately sent Jones's response to her personal e-mail (at 9:58 a.m.).

97.    Huffman's inquiries regarding the developing Demopolis project are telling.  That project was outside the scope of Huffman's normal work for WestRock Services.

98.    Huffman's request for additional information about the project was also highly unusual – that is not something she would need to know about or typically request related to her WestRock Services work.

99.    Information contained in the Demopolis Report regarding customer complaints could also be used by a competitor to target specific customers who might be temporarily dissatisfied and therefore potentially more inclined to change vendors.

100.    The information Huffman e-mailed – particular the information she obtained regarding the confidential project in Demopolis – are trade secrets.

101.    Moreover, Huffman immediately e-mailed Jones's description of the project to her personal e-mail account, demonstrating she obtained that information for future use.

**C.     Huffman misappropriated WestRock Services's confidential production schedules.**

102.    WestRock's production runs are generally product-specific.  Put in simple terms, a production machine or extruder has to be specifically set up to produce one type or size of product at a time.

103.    Setting up the equipment can be an involved and time-consuming process, with equipment being modified and different calipers and handling components being installed and quality tested

104.    Every hour a machine is transitioning to another product or grade, and therefore out of use, represents an opportunity cost to WestRock.

105.    For that reason, WestRock Services uses a sophisticated planning and logistics system to schedule runs of specific batches of products to ensure that customer requirements are met and machine down-time is minimized.

106.    It schedules its runs as much as a year in advance in furtherance of this purpose. In the fourth quarter of each year, WestRock Services produces what is called an "Anchor Dates" report which shows scheduled runs during each month of the upcoming year.

107.    Those schedules are confidential.  A competitor with his information could, for example, structure its own production schedule in such a way as to undercut WestRock's production for a specific client, contending it can produce similar products more quickly or on a more customer-friendly schedule.

108.    The production schedules also provide insight into WestRock's logistical processes and approaches – information that could assist a competitor to develop or improve its own production systems and processes.

16

109.     The production schedules are trade secrets.

110.     Huffman stole four (4) documents related to WestRock's production schedules.

111.     On December 5, 2017 at 7:21 p.m. – the day before her departure – Huffman e-mailed herself WestRock Services's Anchor Dates reports for 2016, 2017, and 2018.

112.     The 2018 report would be extremely valuable to a competitor for the reasons described above – the competitor could adjust its own production schedule to make it more amenable to specific WestRock Services customers.

113.     The 2016 and 2017 reports are also valuable, and would provide a competitor with detailed historical information as to how WestRock organizes its production, thereby providing deeper insight into WestRock's operations.

114.     Huffman knew she would be resigning the next day when she e-mailed herself these reports.

115.     No legitimate business reason existed for her to send them to her personal e-mail account.

116.     Huffman e-mailed herself this information so she could share it with her new employer.

117.     In addition to the Anchor Dates reports, on December 5, 2017 (also the day before Huffman resigned), Alison Dormer, WestRock Services's End Market Supply Chain Manager, e-mailed to Huffman and others a weekly report related to WestRock Services's near-term anticipated production and backlogs on each of WestRock's SBS packaging and CNK paper machines  (the "Food Update").

118.     Huffman e-mailed the Food Update to her personal e-mail account at 10:48 a.m., on December 6, 2017, the day she resigned.

17

119.    The Food Update is marked "Internal Use Only."

120.    It provides information related to the production schedules at multiple WestRock mills, whether customer requirements were being met, and the dates on which WestRock's various machines would become available to run new orders.

121.    This information would be immediately valuable to a competitor, who could use it to schedule its own product runs in such a way so as to make itself more attractive to WestRock Services's customers by offering faster run times.

122.    Like the Anchor Dates Reports, the Food Update is a trade secret.

**D.    Huffman took WestRock Services quality assurance documents.**

123.    On November 28, 2017 at 11:37 a.m., Huffman forwarded to her personal e-mail account a series of communications relating to a customer quality complaint between other WestRock Services employees and the customer.

124.    The communications discussed the nature of the complaint, why it occurred, and how it was being resolved.

125.    The underlying communications occurred between October 18, 2017 and November 8, 2017.

126.    A competitor with these communications could use them to target the customer involved and to disparage WestRock's quality control processes.

127.    At 9:37 a.m. on November 28, 2017, Huffman e-mailed Steve Cogar, WestRock Services's Director of Quality at its Covington, Virginia mill.

128.    Claiming that she needed information to address a customer inquiry, Huffman asked Cogar about WestRock's quality testing protocols for certain products.

18

129.     Cogar responded with a detailed answer at 2:23 p.m. on November 28, 2017, and Huffman e-mailed Cogar's response to her personal e-mail account at 2:55 p.m. (32 minutes later).

130.     This information would be valuable to a competitor because it would assist the competitor in developing similar quality programs.

131.     In communicating with Cogar, Huffman was improperly gathering information in anticipation for her departure and new employment, in breach of her obligations to WestRock Services.

**E.     Huffman took other WestRock Services proprietary documents.**

132.     In addition to the foregoing, Huffman sent herself WestRock Services's detailed and comprehensive Customer Quality Center Manual (the "CQC Manual").

133.     The CQC Manual is provided to WestRock Services's customers.     It provides detailed instructions for customers to make claims that the product they received did not meet specifications or was otherwise inadequate.

134.     A competitor in possession of this document could use it to vastly improve its own quality claims processes.

135.     Huffman violated her duty of loyalty as a WestRock Services employee when she sent the CDC Manual to her private account for the purpose of taking it with her to Sappi.

136.     On November 28, 2017 at 11:11 a.m., Huffman forwarded to her personal e-mail account WestRock Services's entire manual for its "EDI" (Electronic Data Interchange) policies and procedures (the "EDI Manual").

137.     EDI is the computer-to-computer exchange of business documents – like bills of lading – in a standard electronic format between business partners.

138.    The EDI Manual is provided to WestRock Services's customers.    It provides detailed instructions and procedures related to the coordination of EDI between WestRock Services and its customers.

139.    Consequently, a competitor in possession of this document could use it to vastly improve its own EDI processes.

140.    Huffman violated her duty of loyalty as a WestRock Services employee when she sent the EDI Manual to her private account for the purpose of taking it with her to Sappi.

141.    Once Huffman knew she was leaving WestRock Services, she engaged in a concerted and deceitful effort to misappropriate and take documents and information that would help her and her new employer unfairly compete.

142.    The documents Huffman stole were, at a minimum, WestRock Services's property, and many of them constitute WestRock Services's trade secrets.

143.    Those documents, as a whole, improperly provide Huffman and Sappi with broad visibility into WestRock Services's key customers, current and historical business strategies, production processes and dates, quality processes and confidential work in development.

144.    With the foregoing information in hand, Huffman began soliciting WestRock Services's customers on behalf of Sappi no later than early 2018.

145.    At least one, and likely more, of the customers Huffman contacted were included on the Key Customer Analysis, and with whom she had no prior material contact.

146.    Huffman is currently using WestRock Services's trade secrets and property to unfairly compete against it.

147.    The information Huffman possesses will be directly relevant to Sappi's anticipated product offerings from its new paper machine in Maine.

20

148.    Huffman cannot reasonably segregate the information she possesses, as it would be critical to her new job, and therefore she will inevitably use and/or disclose WestRock Services's trade secrets during the course of her work for Sappi.

## CAUSES OF ACTION

## COUNT I

### Violation of the Defend Trade Secrets Act ("DTSA")

### (18 U.S.C. §1836 *et seq.*)

149.    Plaintiff re-alleges Paragraphs 1 through 148 of its Complaint as if fully set forth herein.

150.    The DTSA creates a private right of action for the misappropriation of trade secrets used in, or intended for use in, interstate or foreign commerce.

151.    The documents and information Huffman e-mailed to herself, as described above, are trade secrets under the DTSA.

152.    The trade secrets Huffman misappropriated are used in, or intended for use in, interstate or foreign commerce.

153.    The information and documents Defendant misappropriated constitute trade secrets under the DTSA because they derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because WestRock Services took reasonable and practical measures to maintain the secrecy and confidentiality of its trade secrets and confidential information.

154.    Huffman acquired WestRock Services's trade secrets by improper means, by e-mailing them to herself in violation of WestRock Services's policies as she anticipated departing WestRock Services for a competitor.

155.    Huffman's misappropriation of WestRock Services's trade secrets was willful and malicious.

156.    Huffman currently has actual possession of the trade secrets, documents, and information taken from WestRock Services and, therefore, her misappropriation is continuing.

157.    Huffman is improperly using WestRock Services's trade secrets to compete against WestRock Services.

158.    As a proximate result of Defendant's misappropriation of WestRock Services's trade secrets, WestRock Services has suffered harm and is entitled to the remedies provided by 18 U.S.C. §1836(b)(3). This includes (each pled separately and, as necessary, in the alternative):

a.    An injunction to prevent the actual and threatened continuing misappropriation of WestRock Services's trade secrets; and/or

b.    An order requiring Huffman to take immediate steps to protect and preserve WestRock Services's trade secrets; and/or

c.    A judgment for damages equal to WestRock Services's actual loss caused by Huffman's misappropriations; and/or

d.    A judgment for damages in the amount Huffman has been unjustly enriched by her misappropriation; and/or

e.    A judgment requiring Huffman to pay WestRock Services royalties; and/or

f.    A judgment requiring Huffman to pay WestRock Services exemplary damages equal to two (2) times any underlying damages award; and/or

g.    A judgment requiring Huffman to pay WestRock Services for its attorney's fees and costs.

159.    Huffman's aforesaid acts have irreparably harmed WestRock Services, and will continue to irreparably harm WestRock Services unless enjoined by the Court, as a result of which WestRock Services is without adequate remedy at law.

## COUNT II

### Violation of the South Carolina Trade Secrets Act ("SCTSA")

### (1976 S.C. Code, Ann., § 39-8-10, *et seq.*)

160.    Plaintiff re-alleges Paragraphs 1 through 159 of its Complaint as if fully set forth herein.

161.    The confidential information and documents belonging to WestRock Services as described herein constitute trade secrets under relevant provisions of the South Carolina Trade Secrets Act, 1976 S.C. Code, Ann., § 39-8-10, *et seq.*

162.    The confidential documents and information Huffman improperly acquired from WestRock Services derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and were the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

163.    Huffman was informed of or should reasonably have known from the circumstances that the documents and information she misappropriated from WestRock Services constituted trade secrets.

164.    WestRock Services took reasonable and practical measures to maintain the secrecy and confidentiality of its trade secrets and confidential information, including using electronic and physical security measures to protect such information, by implementing policies to protect such information, by training employees on its policies and their statutory obligations, and by requiring its employees to agree to keep confidential information secure. Despite these measures, Huffman misappropriated WestRock Services's trade secrets.

165.    The information and documents Huffman misappropriated were developed by WestRock Services through the expenditure of substantial amounts of time, money, intellectual capital, and energy; was not commonly known by or available to the public; provided WestRock Services with a competitive advantage in its industry.

166.    Huffman had a duty to refrain from using or misappropriating WestRock Services's trade secrets without its permission.  WestRock Services did not grant any such permission to Defendant Harrell to misappropriate its trade secrets.

167.    Huffman's conduct, as set forth herein, constitutes a violation or violations of the South Carolina Trade Secrets Act.

168.    Huffman's misappropriation of WestRock Services's trade secrets was willful and malicious.

169.    As a proximate result of Huffman's misappropriation of WestRock Services's trade secrets, WestRock Services has suffered direct, consequential, and irreparable harm and is entitled to an award of monetary damages, exemplary damages, attorneys' fees, and litigation costs.

170.    WestRock Services is entitled to preliminary and permanent injunctive relief preventing Huffman from continuing to misappropriate its trade secrets.

24

171.    Huffman's aforesaid acts have irreparably harmed WestRock Services, and will continue to irreparably harm WestRock Services unless enjoined by the Court, as a result of which WestRock Services is without adequate remedy at law.

## COUNT III

### Breach of employee fiduciary duties and/or duty of loyalty

172.    Plaintiff re-alleges Paragraphs 1 through 171 of its Complaint as if fully set forth herein.

173.    In employing Huffman to represent its interests, WestRock Services placed a special trust and/or confidence in Huffman, and in so doing provided her with trade secrets so she could perform her job duties.  In undertaking her responsibilities,  Huffman accepted and/or induced the special trust or confidence placed in him by WestRock Services.

174.    Huffman owed WestRock Services a fiduciary duty and a duty of loyalty while employed.

175.    As a consequence, Huffman was bound to act in good faith and with due regard to WestRock Services's interests.  Huffman was not permitted to use her fiduciary relationship with WestRock Services to benefit her own personal interests and/or those of a competitor such as Sappi.

176.    Huffman misappropriated WestRock's trade secrets and property for her own personal benefit and that of Sappi, to the disadvantage and/or detriment of WestRock Services, while Harrell was employed by WestRock Services and was being compensated by WestRock Services.

177.    Huffman tortiously and wrongfully breached her fiduciary duty and duty of loyalty by intentionally misappropriating Plaintiff's trade secrets and property while still employed.

178.    Although the injury to WestRock Services is not fully compensable by monetary relief, WestRock Services is entitled to actual, compensatory and exemplary damages for Huffman's breaches of duty.

179.    WestRock Services is further entitled to preliminary and permanent injunctive relief requiring Huffman to return and/or destroy all of the information she wrongfully obtained from WestRock Services as a result of her breaches of duty and to refrain from soliciting any customer listed on WestRock Services's Key Customer Analysis.

180.    Huffman's aforesaid acts have irreparably harmed WestRock Services, and will continue to irreparably harm WestRock Services unless enjoined by the Court, as a result of which WestRock Services is without adequate remedy at law.

## COUNT IV

### Unjust Enrichment

181.    Plaintiff re-alleges Paragraphs 1 through 180 of its Complaint as if fully set forth herein.

182.    As a result of WestRock Services's hard work and substantial investment, its customer relationships, strategic analysis, and property are valuable to it.

183.    Huffman's wrongful conduct has resulted, and will continue to result, in Huffman being unjustly enriched through her unauthorized taking and use of WestRock Services's trade secrets and property.

184.    WestRock Services has been and will continue to be harmed by Huffman's wrongful conduct.

185.    As a result of Huffman's foregoing unlawful actions, Huffman has avoided considerable expense that she and/or her employer otherwise would have incurred to develop the same customer relationships and proprietary analysis as WestRock Services.

186.    Huffman was unjustly enriched at the expense of WestRock Services, and in violation of the common law of the State of South Carolina.

187.    Huffman's aforesaid acts have irreparably harmed WestRock Services, and will continue to irreparably harm WestRock Services unless enjoined by the Court, as a result of which WestRock Services is without adequate remedy at law.

188.    As the direct and proximate result of Defendant's deliberate and intentional infringement, WestRock Services continues to suffer injury in an amount not yet ascertained, including future damages from loss of sales and other lost business opportunities.

## PRAYER FOR RELIEF

WHEREFORE, WestRock Services requests the following relief:

(a)    That Huffman be enjoined, preliminarily and thereafter permanently, from retaining, using or disclosing any of WestRock Services's trade secrets or property;

(b)    That Huffman be directed to immediately search for, specifically account for, segregate and return to WestRock Services all of its documents and information and any copies, summaries, notes or work product relying on, incorporating, referencing or relating to the documents or information contained in those documents, in her possession, custody or control;

(c)    That Huffman be ordered to identify all people or entities with whom WestRock Services's information has been shared (or on whose computer systems such information has been stored), in whole or in part, whether in writing, electronically, or orally;

(d)    That Huffman be ordered to promptly produce her computer, tablet, phone and/or all data storage devices in her possession custody and/or control for forensic inspection, and be ordered not to remove, destroy, alter or modify any files on his computer, table, phone and/or other data storage device until the forensic investigation is completed;

(e)    That Huffman be enjoined from soliciting clients on any client list she misappropriated from WestRock Services for the purpose of competing against WestRock Services;

(f)    That Huffman pay damages to WestRock Services for any actual losses, damages or unjust enrichment caused by her misappropriation of trade secrets and property;

(g)    That Huffman be ordered to pay exemplary damages, attorneys' fees, and litigation costs, based upon her violation of the DTSA, SCTSA, and common law for her bad faith taking of WestRock Services's property and trade secrets;

(h)    That Huffman be ordered to pay the costs of these proceedings;

(i)    That Plaintiff be granted a trial by jury on all issues so triable; and

(j)    The Court order such other and further relief as it deems appropriate.

Respectfully submitted this 21st day of March, 2018.

YOUNG CLEMENT RIVERS, LLP

By:      */s/Carol B. Ervin*
Carol B. Ervin, Esquire, Federal ID No. 734
E-mail:  cervin@ycrlaw.com
Brian L. Quisenberry, Esquire, Federal ID No. 9684
E-mail:  bquisenberry@ycrlaw.com
Stephanie N. Ramia, Esquire, Federal ID No. 11783
E-mail:  sramia@ycrlaw.com
P.O. Box 993, Charleston, SC  29402-0993
25 Calhoun Street, Suite 400, Charleston, SC 29401
Telephone:  (843) 724-6641
Fax:  (843) 579-1325

HAWKINS  PARNELL  THACKSTON  &  YOUNG, LLP

Ronald G. Polly, Jr., Esquire, Georgia Bar No. 583264
E-mail:  rpolly@hptylaw.com
Matthew A. Boyd, Esquire, Georgia Bar No. 027645
E-mail:  mboyd@hptylaw.com
303 Peachtree Street, Suite 4000
Atlanta, GA  30308
Telephone:  (404) 614-7400
Fax:  (404) 614-7500

*Attorneys for the Plaintiff*

Charleston, South Carolina

Dated: March 21, 2018